FILED

12/28/2021

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 1, 2021

## IN RE ZIAN L.

**Appeal from the Juvenile Court for White County**
**No. 4930/JV-1801      Sammie E. Benningfield, Jr., Judge**

_____

### No. M2021-00879-COA-R3-PT

_____

This appeal concerns the termination of a mother's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for White County ("the Juvenile Court") seeking to terminate the parental rights of Hope H. ("Mother") to her minor son Zian L. ("the Child"). After a hearing, the Juvenile Court entered an order terminating Mother's parental rights on three grounds and finding that termination of Mother's parental rights is in the Child's best interest, all by the standard of clear and convincing evidence. Mother appeals, arguing that the Juvenile Court erred in its best interest determination. We affirm the judgment of the Juvenile Court in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

J. Patrick Hayes, Cookeville, Tennessee, for the appellant, Hope H.

Herbert H. Slatery, III, Attorney General and Reporter; and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born to Mother in December 2013.[1]  On January 31, 2020, DCS received a report alleging that Mother had exposed the Child to drugs.  Mother also was arrested for harboring a fugitive.  While in jail, Mother reported to DCS that she used methamphetamine two or three days before.  Mother took a drug screen, which was positive for methamphetamine, amphetamine, and ecstasy.  On February 4, 2020, the Child entered state custody pursuant to an order entered by the Juvenile Court upon a petition of dependency and neglect.  On February 10, 2020, the Child took a hair-follicle screen which was positive for methamphetamine.

In February 2020, a permanency plan was developed for Mother.  Mother had a number of responsibilities under the permanency plan, to wit: refrain from associating with persons suspected or known to manufacture, sell, or use drugs; not allow any such people in her home or around the Child; allow random pill counts; submit to an alcohol and drug assessment and follow recommendations; sign releases of information for DCS so it could track her progress; comply with random drug screening; complete a psychological evaluation and follow recommendations; use age-appropriate parenting techniques during visitation and demonstrate her ability to provide for the Child's basic needs; complete a clinical parenting assessment and follow recommendations; maintain a safe home; provide DCS with proof of residence; allow DCS to make random, unannounced home visits; resolve criminal charges; refrain from incurring new criminal charges; visit the Child for four hours per month; notify DCS 24 hours in advance if she were unable to attend a visit; and make visits with the Child meaningful.  Mother's responsibilities under the permanency plans remained the same up through the filing of DCS's petition.  On March 17, 2020, Mother signed the Criteria and Procedures for Termination of Parental Rights.

In June 2020, the Juvenile Court entered its adjudicatory and final dispositional order in which it adjudicated the Child dependent and neglected.  In its order, the Juvenile Court found that the Child was a victim of severe child abuse perpetrated by Mother as defined at Tenn. Code Ann. § 37-1-102(b)(27).  The severe child abuse finding was based upon the Child having tested positive for methamphetamine and Mother's admissions regarding her use of methamphetamine days before the Child's removal.  Mother did not appeal this order.

---

[1] B.L. was named on the Child's birth certificate as the Child's father.  B.L. has surrendered his parental rights to the Child.  M.H., the Child's alleged father, signed a Waiver of Interest and Notice regarding the Child in August 2020.  This appeal concerns only Mother's parental rights to the Child.

In August 2020, DCS filed a motion seeking to be relieved of reasonable efforts as to Mother. DCS cited, among other things, Mother's failure to participate in any services despite DCS's efforts. DCS also cited the fact that the Child had been adjudicated a victim of severe child abuse. Mother did not contest DCS's motion. On August 17, 2020, the Juvenile Court entered an order granting DCS's motion. Meanwhile, as the case unfolded, Mother continued to incur criminal charges. On July 17, 2020, Mother pled guilty to resisting arrest. She was sentenced to five months and 29 days of supervised probation. On February 26, 2021, Mother's probation was revoked for failing to report; incurring new legal charges; and using illegal drugs. Mother was ordered to serve her five-month, 29-day sentence in jail, with credit given for time served. Mother also pled guilty to possession of more than 26 grams of methamphetamine for sale or delivery, a Class B felony, and was sentenced to eight years of supervised probation.

On November 9, 2020, DCS filed a petition in the Juvenile Court seeking to terminate Mother's parental rights to the Child. DCS alleged against Mother the grounds of abandonment by incarcerated parent for failure to support; abandonment by incarcerated parent for failure to visit; abandonment by wanton disregard; abandonment by failure to establish a suitable home; substantial noncompliance with the permanency plan; persistent conditions; severe child abuse; and failure to manifest an ability and willingness to assume custody. DCS alleged further that termination of Mother's parental rights would be in the Child's best interest. Mother did not file an answer to DCS's petition. DCS also filed a motion asking the Juvenile Court to suspend Mother's visitation with the Child. DCS alleged that Mother had failed to participate in services; had tested positive for methamphetamine on September 25; was facing criminal charges; had not maintained regular visitation with the Child; and behaved inappropriately when she did visit. On November 16, 2020, the Juvenile Court granted DCS's motion and suspended Mother's visitation with the Child.

In June 2021, a hearing was conducted before the Juvenile Court on DCS's termination petition. Mother did not appear at the hearing, although her appointed counsel was present. First to testify was DCS family services worker Alicia Wright ("Wright"). Wright first came into contact with the family after the Child entered state custody in February 2020. Wright testified to her objective when working with the family: "My primary objective was to restore [the Child] to his mother; provide services to the mother to stabilize her lifestyle; help her to gain sobriety; help her to gain employment; help her to gain proper housing; and allow her mental health to be treated properly." Ultimately, when these efforts did not bear fruit, Wright asked DCS to file a petition to terminate Mother's parental rights. DCS initiated the underlying dependency and neglect case when it "received a referral, alleging drug abuse by [Mother] in the family home, present, when [the Child] was there. There were also some criminal charges at that time." According to

Wright, the dependency and neglect petition was necessitated by parental substance abuse; inappropriate living conditions; and Mother's incarceration. Mother had custody of the Child at the time of his removal. The Child has been in DCS custody continuously since his removal. Mother never was awarded unsupervised visitation. All told, DCS developed four permanency plans for Mother. In particular, Wright testified to three ratified permanency plans dated February 25, 2020; July 1, 2020; and December 16, 2020, respectively. The goal of the initial plan was return to parent and adoption. The goal of the second plan also was return to parent and adoption. In the third plan, the goal was adoption only. Wright testified that DCS offered "substantial assistance" to Mother to help her complete the permanency plans, although ultimately to no avail. Wright stated:

> Well, we had the permanency plan meeting. She did not attend the first one; however, we did go meet with her, explain the outlines of the responsibilities of the plan, and we gave her the responsibilities sheet that outlines exactly what she should do. We also set up those appointments for her, both mental health treatment, substance abuse treatment, parenting assistance. We also referred her to the Tennessee Career Center, to gain employment. We did a lot of things with her.
> There's been a lot of conversations, phone conversations that included just her, and then also her and her attorney to explain the, what we were asking her to do to remedy the circumstances that brought [the Child] into custody.

Wright testified that Mother did not substantially comply with the permanency plans. Wright stated: "[Mother] has a lack of concern for her child. She had no desire to complete any of the action steps on the plan, despite being offered substantial assistance to do so." Wright testified that Mother failed to complete any of the tasks outlined in the permanency plans. In Wright's opinion, Mother would not complete her permanency plan in the near future:

> That's my opinion, based on the fact that we have offered here, again, substantial assistance, both transportation; we've made phone calls with her; we've set up appointments for her; we've provided phone numbers, and all the things she needed, as well as just support for her and encouragement. And she's not taken advantage of any of those things, so I do not see it changing in the near future.

Continuing her testimony, Wright stated that the Child was the victim of severe child abuse perpetrated by Mother as reflected in the Juvenile Court's adjudicatory dispositional hearing order. That order was not appealed. When asked if Mother had failed

-4-

to manifest an ability to assume legal and physical custody of the Child, Wright answered in the affirmative:

> [Mother], despite, again being referred to, for instance, the Tennessee Career Center, we also referred her to the Department of Human Services for food stamps assistance, to apply for insurance and things like that to stabilize her financially. She did not follow through with any of those and did not gain employment to be able to provide for [the Child].

Wright testified further that Mother failed to manifest a willingness to assume custody of the Child, stating:

> Again, she's, she's just not willing to participate in any of the services to stabilize her life, and that's a willingness on her part. There was no barrier that was ever identified by [Mother] or any member of the team that we could have assisted her with. And so, in the end, it was [Mother's] unwillingness to complete any of the action steps, including gaining sobriety, stabilizing her mental health, gaining employment, or providing for [the Child] in any way, emotionally, physically or financially.

Wright testified that Mother, who was absent from the hearing, had full knowledge of the hearing. In Wright's view, placing the Child with Mother at this time or in the near future would "pose a substantial risk to [the Child]." None of the conditions that required the Child's removal in the first place had been resolved. Regarding any prospect that Mother could earn money, Wright testified: "Early in the case, [Mother] reported that she allows her land to be rented for cattle, but then provided no receipts or payments for that." Mother paid no monetary child support to the Child's foster parents. Mother had not given the foster parents any non-monetary support such as food, clothes, diapers, etc., either. Wright testified: "No, [Mother] refused to engage at all with the foster parents, despite the Department's attempt at forming that relationship between the two parties." According to Wright, Mother was able-bodied and capable of working, as she had "never provided otherwise…." Wright testified that Mother "never stated otherwise that she was not able to work or provide any type of financial assistance." DCS had gone over the Criteria and Procedures for Termination of Parental Rights with Mother. Wright filed an affidavit of reasonable efforts in this case and asked the Juvenile Court to adopt the affidavit as her testimony in regard to DCS's reasonable efforts.

Turning to the matter of the Child's best interest, Wright testified that Mother had not made an adjustment of circumstances so as to make it safe for the Child to be in Mother's home:

[Mother] continues to participate in a criminal lifestyle, including methamphetamine use and other criminal acts. She also still lives in the removal home and none of the situations in the removal home have been remedied. [Mother] also continues, again, to be incarcerated. She's been incarcerated several times throughout the life of the case in different counties. Even when [Mother] was visiting, she, she doesn't have patience with [the Child]. She's very short on her, I guess, her anger level with him. And then, she also would always end the visits early, despite the fact that the Department was giving her a substantial amount of visits for the month. She would always end them early.

Mother did not attend all of the Child's medical appointments. The last appointment Mother attended was for the Child's dental surgery; Mother "became angry and frustrated because she was asked to wear a mask during the pandemic, by the provider, and felt she was being disrespected. And so, never attended another visit after that point." As explained by Wright, keeping up with medical and dental appointments was especially crucial for the Child given his history:

When [the Child] entered custody, he had, his front part of his teeth were rotted almost to the gum, so they had to be surgically removed. And he also had a broken thumb that the pediatrician felt had been broken for several weeks with no medical attention, that was also infected that required care. So, [the Child] had to have substantial medical appointments in the beginning, both dental and then also to treat his finger, including to see an orthopedist.

Mother reported that she had not taken the Child—who entered state custody at age six—to a physician since he was two or three months old. In addition, the Child had never been to the dentist. In Wright's estimation, Mother was in substantially the same position on the day of the hearing that she was when the Child was removed into state custody.

With respect to visitation, Wright testified that from February through May of the previous year, Mother visited the Child just a few minutes per visit. When pandemic restrictions were lifted in August, in-person visits resumed. Mother cancelled two visits and tended to cut visits short when she did make them. Wright described Mother's behavior during both her video and in-person visits:

[Mother's] conduct during visitation, through the video visits, she would become very frustrated with [the Child]. She would try to force him to engage with her, by demanding that he tell her about his day. But it wasn't in a motherly-type way. When she didn't receive the answer that she desired,

she would then say, [w]ell, you can just go play. And then would end the call or end the video visit.

Same with the in-person visits. Our very first one, she engaged for about an hour. The foster mom had came to check on [the Child], just to make sure he was doing okay, and at that point, [Mother] wanted to end the visit. But I asked her to continue, since they hadn't had in-person contact for a while. She did then end the visit still 17 minutes early. Her contact, she's able to manage [the Child] for very few minutes during the visits before becoming overly frustrated with him and asking to end the visit with him.

Asked if the Child had a meaningful relationship with Mother, Wright answered bluntly: "[The Child] is terrified of his mother…[s]o, no, there's no meaningful relationship." On Mother's last visit, the Child had a "meltdown" while clinging fearfully to his pet cat and screaming that he did not want to see Mother. At that juncture, DCS asked for the visits to stop. Wright testified that Mother had sacrificed reunification with the Child for methamphetamine. In Wright's view, a change of caretaker would have a negative effect on the Child's well-being:

When [the Child] entered custody, he was not potty trained, and again, we've touched on the medical neglect, but again, he was, his entire frontal teeth were rotted out. Again, he was not potty trained. He would hold his bowel movements out of fear. He was not able to verbalize, like a child his age would. Developmentally, he was behind. The foster parents have worked diligently to potty train the six year old that came to their home, have enrolled him in school where he's excelled. He is emotionally bonded with this family, and all of his needs are met there. And he's an integral part of their family.

Wright stated that Mother's home was unhealthy and unsafe for the Child. In addition, there was ongoing criminal activity in Mother's home. On a home visit, the Child's room looked "like a construction site." The entire house, except for the living room, was in "disarray." Wright testified: "[Mother] has housing. She lives with her mother. But her mother is mentally unstable, as is [Mother]. And the physical living condition of the home was not appropriate for a child." DCS had a negative history with Pamela V., the Child's maternal grandmother. DCS had explored placing the Child with Pamela V. but determined that she was not a feasible option. Wright testified further that Mother reported having mental health needs, but Mother refused any services aimed at addressing those needs.

When the Child initially entered state custody, he had a heart arrhythmia. Wright stated, however, that "[s]ince he's been stable in the foster home and now is no longer

exposed to drugs, there's no more concern with that." Asked if Mother had contributed anything to the Child's physical care, Wright stated: "She's not. She's not provided anything other than when she came to visits a couple of times. She did bring a little Lunchable." Regarding the Child's current home life, Wright stated he had been with his foster family since he first entered state custody in February 2020. The foster parents have a biological child and two adopted children. Wright testified that the foster parents are ready, willing, and able to adopt the Child. Wright stated:

> [S]o all of the children are around the same age, with [the Child] being the oldest, and the youngest is about two years old. And they all play just like natural biological siblings. I know, I observed them just a couple of weeks ago at the park and they were all playing in the sand box together, and sliding on the slides. So, [the Child] is an integral part; he's fully acclimated into this family, and even within the sibling group.

The foster parents also allowed the Child to maintain a relationship with his four older biological siblings.

Brittany S. ("Foster Mother"), the Child's foster mother, was the next and final witness. Foster Mother is a special education teacher. Her husband is a registered nurse working toward becoming a nurse practitioner. Foster Mother testified to the quality of interaction between the Child and the other children in their home: "Actually, I think [the Child] was exactly what our biological son needed. They just connected immediately, as he connected with us, too. I mean, I'm going to cry, thinking of it. We just love him to death. And he is learning to be an awesome big brother. He is really great with them." Foster Mother ensured that the Child went to all of his medical and dental appointments, and the Child's medical and dental needs are all up-to-date. Foster Mother stated that she is ready, willing, and able to adopt the Child were he to become available for adoption. Asked in conclusion if there were anything else she wished to add, Foster Mother testified: "Just that [the Child] has made significant progress. This kid came to us, as a six year old, who wasn't potty trained and had never been in school and couldn't communicate. And now, he's making great grades, playing baseball, being a good big brother. I mean, he's awesome."

In July 2021, the Juvenile Court entered its final judgment terminating Mother's parental rights to the Child. The Juvenile Court found that the following grounds were proven by clear and convincing evidence: (1) substantial noncompliance with the permanency plan; (2) severe child abuse; and (3) failure to manifest an ability and willingness to assume custody.[2] The Juvenile Court also found by clear and convincing

---

[2] At trial, DCS voluntarily dismissed the other grounds it had pled.

evidence that termination of Mother's parental rights is in the Child's best interest. In its final judgment, the Juvenile Court found, in pertinent part:

## THE COURT'S RULING AS TO [MOTHER] ON THE GROUNDS ALLEGED

### *Substantial Noncompliance*

15. The Court finds by clear and convincing evidence that [Mother] has not substantially complied with the provisions of the permanency plans in that the Court ratified the permanency plans and found them to be reasonable, necessary, and in the best interest of the child; that all of the permanency plans clearly identify in writing the statements of responsibilities for [Mother]; that the requirements in the permanency plans were all reasonably related to remedying the conditions that necessitate foster care; that [Mother] did not complete the requirements in the permanency plans; that there is little likelihood that [Mother] will complete the plans in the near future; and that [Mother] was advised of the Criteria and Procedure for Termination of Parental Rights and understood the grounds for termination of parental rights.
16. Ms. Wright testified that four (4) permanency plans were developed in [the] underlying dependency and neglect case.
17. Ms. Wright further testified that the first three (3) plans were ratified by the Court and found to be reasonable, necessary, and in the best interest of the child.
18. Regarding compliance, Ms. Wright testified that [Mother] did not complete any of the requirements in the permanency plans. Thus, the Court finds that [Mother] has failed to comply with the permanency plans in any respect.
19. With respect to whether [Mother] knew what to do to be in compliance, Ms. Wright testified that [Mother's] requirements were clearly identified in writing on the plans. Furthermore, Ms. Wright testified that the Department had met with [Mother] and explained the outline of responsibilities to her. Ms. Wright also testified that the Department provided [Mother] with a "responsibilities sheet" of exactly what she was required to do. Moreover, Ms. Wright testified that … a lot of conversations had taken place between the Department and [Mother] and between [Mother] and her attorney to explain [the] plans' requirements. Thus, the proof before the Court is that [Mother] knew what was required of her.
20. With respect to future compliance, Ms. Wright testified that [Mother] has no desire to complete any of the action steps. Ms. Wright further testified that [Mother] is not likely to complete the plans' requirements in the near

[future]. Ms. Wright based her testimony upon the fact that [Mother] had not taken advantage of the substantial assistance offered by the Department. Thus, the proof before the Court is that there is little likelihood of [Mother] complying with the permanency plans in the near future.

21. The record reflects that [Mother] signed the acknowledgment of receipt of the Criteria and Procedure for Termination of Parental Rights on March 17, 2020, and on September 15, 2020.

22. Therefore, pursuant to Tenn. Code Ann. § 36-1-113(g)(2), the Court finds by clear and convincing evidence that [Mother] is in substantial noncompliance with the permanency plans.

### Severe Child Abuse

23. The Court finds by clear and convincing evidence that on June 15, 2020, the Court found [the Child], the child who is the subject of this proceeding, to be the victim of severe child abuse, as defined at Tenn. Code Ann. § 37-1-102, perpetrated by [Mother], and that the Adjudicatory and Final Dispositional Order filed on June 15, 2020, concerning said child is a Final Order.

24. The record reflects that the action by [Mother] which constitutes severe child abuse includes exposing the child [to] methamphetamine as evidenced by the child's hair follicle drug test and [Mother's] admission of using the substance within two (2) days prior to the removal.

25. Therefore, pursuant to Tenn. Code Ann. § 36-1-113(g)(4), the Court finds by clear and convincing evidence that the parental rights of [Mother] should be terminated.

### Failure to Manifest a Willingness and Ability

26. The Court finds by clear and convincing evidence that [Mother] has failed to manifest, by act or omission, a willingness and ability to personally assume legal and physical custody or financial responsibility of the child and that placing the child in the legal and physical custody of [Mother] would pose a risk of substantial harm to the physical or psychological welfare of the child.

27. Regarding [Mother's] failure to manifest a willingness to assume custody, Ms. Wright testified that [Mother] did not complete any of the permanency tasks. Furthermore, Ms. Wright testified that no barrier was identified which would have prevented [Mother] from completing the action steps. Moreover, Ms. Wright testified that [Mother] is not willing to

participate in services. Thus, the proof before the Court is that [Mother] has failed to manifest a willingness to assume custody of the child.

28. With respect to [Mother's] failure to manifest an ability to assume custody, Ms. Wright testified that [Mother] did not follow through with any of the services offered to reunify. Thus, the proof before the Court is that [Mother] has failed to manifest an ability to assume custody of the children.

29. The Court finds that [Mother] did not appear in defense of her parental rights and show any interest in the child demonstrating probably more greatly her failure to manifest a willingness and ability to assume custody.

30. Concerning [Mother's] failure to manifest a willingness and ability to assume financial responsibility for the child, Ms. Wright testified that [Mother] had not shown a sufficient means of income to support the child's basic needs. Ms. Wright further testified that [Mother] had refused to gain employment throughout the underlying dependency and neglect case. Ms. Wright testified that to her knowledge, [Mother] had not provided any non-monetary support to the foster parents even though [Mother] was able-bodied and capable of working and support the child. To that end, the record reflects that [Mother] has not paid child support. The Court finds that [Mother] is not financially capable of being responsible for the child, despite being physically capable of doing so. Thus, the proof before the Court is that [Mother] has failed to manifest a willingness and ability to assume financial responsibility for the child.

31. Regarding a substantial risk of harm to the child, Ms. Wright testified that none of the conditions that required the removal had been resolved and that placing the child with [Mother] at this time or in the near future would pose a substantial risk of harm. Thus, the proof before the Court is that placing the child in the legal and/or physical custody of [Mother] would pose a risk of substantial harm to the child.

32. Therefore, pursuant to Tenn. Code Ann. § 36-1-113(g)(14), the Court finds by clear and convincing evidence that the parental rights of [Mother] should be terminated.

**THE COURT'S RULING AS TO [MOTHER] REGARDING THE BEST INTEREST OF THE CHILD**

33. The Court finds by clear and convincing evidence that it is in the best interest of the child for the parental rights of [Mother] to be terminated.

34. Regarding the best interest of the child, the Court adopts the comprehensive analysis of the Guardian ad Litem, Macey Gurley.

35. Pursuant to Tenn. Code Ann. § 36-1-113(i)(1), the Court finds that [Mother] has a lengthy criminal history. [Mother] was recently released from

incarceration due to methamphetamine charges. When [Mother] was released, she returned to the same home that the child was removed from. Criminal activity and substance abuse do not make the home safe and appropriate. Little to nothing has been done on [Mother's] end to remedy the conditions. [Mother] has not even done the bare minimum, which is to appear today. [Mother] has chosen her drugs of choice over custody of the child. Thus, the Court finds that [Mother] has failed to make an adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home with her.

36. Pursuant to Tenn. Code Ann. § 36-1-113(i)(2), the Court finds that despite the Department's numerous efforts, [Mother] is at ground zero. [Mother] has failed to complete any of the necessary steps on the permanency plans. Every reasonable effort was made on behalf of the Department to assist in that regard and to achieve the goals; however, [Mother] was not willing to participate in services. [Mother] is in substantially in the same position that she was in at the time of the removal. Every step of the way, [Mother] fought or failed to complete something. Thus, the Court finds that [Mother] has failed to effect a lasting adjustment after reasonable efforts for such a duration of time that a lasting adjustment does not reasonably appear possible.

37. Pursuant to Tenn. Code Ann. § 36-1-113(i)(3), the Court finds that [Mother] participated in some video calls that were often met with frustration and anger by [Mother]. When in-person visitation resumed, it was poor. [Mother] did not engage with the child. [Mother] often became frustrated and was either late to the visit or ended it early. Visitation ultimately had to be suspended because of the effect on the child and exhibited behaviors. Thus, the Court finds that [Mother] has failed to maintain regular visitation or other contact with the child.

38. Pursuant to Tenn. Code Ann. § 36-1-113(i)(4), the Court finds that at the last in-person visit that the child was so fearful of [Mother] that he had a meltdown. Thus, the Court finds that a meaningful relationship has not been established between the child and [Mother].

39. Pursuant to Tenn. Code Ann. § 36-1-113(i)(5), the Court finds that the child's condition when placed with prospective adoptive parents includes not being potty trained at six-years-old, speech problems due to rotted teeth, and severe medical issues. The prospective adoptive parents have addressed all of that. The child is thriving at school, is potty trained, and the prospective adoptive parents have worked at length to get the child at the level of learning and development he needs to be. The child is deeply bonded not only with the prospective adoptive parents, but also with the other children in their home and acts like their big brother. Thus, the Court finds that a change of

caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological, and/or medical condition.

40. Pursuant to Tenn. Code Ann. § 36-1-113(i)(6), the Court finds that [Mother] was recently released from jail, returned to the same home that [the] child was removed from, and that the maternal grandmother, who lives in the home, has mental health issues as does [Mother]. The home is in such poor condition that the child was not only removed due to substance abuse, but also for medical neglect as previously discussed. In that regard, the maternal grandmother and [Mother] exhibited such neglect toward the child that it warranted removal and continues to do so. Thus, the Court finds this factor weighs in favor of terminating [Mother's] parental rights.

41. Pursuant to Tenn. Code Ann. § 36-1-113(i)(7), the Court finds that [Mother] was recently incarcerated due to methamphetamine. [Mother's] incarceration indicates that there is still criminal activity to some degree in the home making it unsafe and inappropriate for the child to return to in a safe and stable way. Thus, the Court finds that this factor weighs in favor of terminating [Mother's] parental rights.

42. Pursuant to Tenn. Code Ann. § 36-1-113(i)(8), the Court finds that [Mother] failed not only to complete any type of substance abuse treatment, but also failed to remedy her mental health issues. [Mother] has not appeared today to argue that her mental and/or emotional status would be sufficient to raise the child. The child is fearful of [Mother]. [Mother] became frustrated by that and did not fully utilize what would be available to her, which was establishing a relationship with the child. Thus, the Court finds that the mental and/or emotional status of [Mother] would be detrimental to the child and prevent her from providing safe and stable care and supervision.

43. Pursuant to Tenn. Code Ann. § 36-1-113(i)(9), the Court finds that [Mother] failed to pay any level of child support. [Mother] is in arrears. The only thing that [Mother] has provided to the child in foster care is a Lunchable, which does not even rise to the level of token support. [Mother] has done nothing to assist and support through the Child Support Guidelines. [Mother] has not provided other support such as food, clothing, books, or anything. Thus, the Court finds that [Mother] has failed to support the child.

44. The Court finds that the child is in an extremely good preadoptive home. The prospective adoptive parents have met every need that the child has. The child is prospering, doing well, and the prospective adoptive parents are to be congratulated and appreciated for their efforts.

45. Therefore, the Court finds by clear and convincing evidence that it is in the best interest of the child for the parental rights of [Mother] to be terminated.

Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following single issue on appeal: whether the Juvenile Court erred in finding by clear and convincing evidence that termination of Mother's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### *B. Standards of Appellate Review*

---

[5] Tenn. Code Ann. § 36-1-113(i).

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Mother does not challenge any of the grounds for termination of parental rights found against her. The Tennessee Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, we will review each of the grounds found against Mother.

On November 9, 2020, when DCS filed its petition against Mother, the applicable grounds for termination of parental rights were set forth by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

\*\*\*

-17-

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

\*\*\*

(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child;

\*\*\*

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child;

Tenn. Code Ann. § 36-1-113(g) (West March 6, 2020 to April 21, 2021).

We first address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan. With respect to what constitutes substantial noncompliance with a permanency plan, this Court has explained:

Not every failure to comply with a permanency plan will constitute grounds for termination of parental rights. *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at \*14 (Tenn. Ct. App. Sept. 14, 2012). As the statute clearly reflects, "noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial." *In re Valentine*, 79 S.W.3d at 548. "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537. "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

-18-

Although the terms have sometimes been used interchangeably, this Court has recently clarified that the question is not whether the parent was in "substantial compliance" with the permanency plan. *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *15 (Tenn. Ct. App. May 8, 2018). "Section 36-1-113(g)(2) does not require that a parent 'substantially comply' with a permanency plan." *Id.* "Rather, the appropriate standard is whether there has been 'substantial *noncompliance*.' " *In re Jaylah W.*, 486 S.W.3d 537, 555 (Tenn. Ct. App. 2015) (emphasis added); *see also In re Valentine*, 79 S.W.3d at 548 ("the noncompliance must be substantial").

We also recognize that when analyzing this ground, "[o]ur concern is with the parent's *efforts* to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *5 (Tenn. Ct. App. July 10, 2020) (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)) (emphasis added). In other words, " 'outcome achievement is not the measure of compliance.' " *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *6 (Tenn. Ct. App. July 28, 2017) (quoting *In re B.D.*, 2009 WL 528922, at *11).

*In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *14 (Tenn. Ct. App. Dec. 22, 2020), *no appl. perm. appeal filed*.

The Juvenile Court found that the permanency plans ratified in this case were reasonable, necessary, in the Child's best interest, and contained requirements reasonably related to the conditions necessitating foster care. The Juvenile Court found further, however, that Mother "failed to comply with the permanency plans in <u>any</u> respect." (Emphasis added). Indeed, the evidence in the record on appeal reflects a less-than-minimal effort on Mother's part to try to fulfill any of her responsibilities under her permanency plans, even with DCS's substantial assistance. Despite knowing what she needed to do in order to have a chance at reunification with the Child, Mother's level of noncompliance with her permanency plans was substantial. The evidence does not preponderate against the Juvenile Court's findings relative to this ground. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of severe child abuse. We have previously determined that a prior finding by a juvenile court in dependency and neglect proceedings can be *res judicata* in parental rights termination

-19-

proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents the issue from being re-litigated in the subsequent parental rights termination proceeding. *Id*. In June 2020, the Juvenile Court entered its adjudicatory and final dispositional order in which it adjudicated the Child dependent and neglected. In its order, the Juvenile Court found that the Child was a victim of severe child abuse perpetrated by Mother as defined at Tenn. Code Ann. § 37-1-102(b)(27). The severe child abuse finding was based upon the Child having tested positive for methamphetamine and Mother's admissions regarding her use of methamphetamine days before the Child's removal. The record contains no evidence that Mother ever appealed the finding of severe child abuse. Mother did not challenge the finality or validity of the order finding severe child abuse either in the proceedings below or on appeal. *Res judicata* thus applies to this ground. In view of these facts, we find, as did the Juvenile Court, that the ground of severe child abuse was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. With respect to this ground, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original, citation omitted). The second prong of the statute requires us to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Regarding the first prong, the Juvenile Court found that Mother manifested neither the ability nor the willingness to assume custody or financial responsibility of the Child. The record bears out this factual finding. With respect to willingness, Mother has taken no meaningful steps whatsoever to engage with social services. Mother's visits with the Child were marred by her inappropriate behavior. She also tended to end the visits early. With respect to ability, Mother's circumstances have not changed. The Child entered state custody due to drug exposure in Mother's custody, specifically methamphetamine. The Child was found to be the victim of severe child abuse perpetrated by Mother. There is no evidence Mother has rectified her drug problem. On the contrary, Mother has incurred drug charges since the Child's removal. In addition, there is no hint that Mother can financially support the Child or provide the Child with suitable housing. The evidence does not preponderate against the Juvenile Court's finding that Mother has manifested neither the willingness nor the ability to assume custody of the Child. Turning to the second prong, the Juvenile Court found that, as none of the conditions that required the removal had been resolved, placing the child in the legal and/or physical custody of Mother would pose a risk of substantial harm to the Child. Given the Child's condition upon entering state custody and Mother's failure to remedy the circumstances that led to the

-20-

Child being neglected and severely abused in the first place, the risk of substantial harm to the Child's physical or psychological welfare were he to be returned to Mother's custody is clear. The evidence does not preponderate against the Juvenile Court's findings as to either prong of this ground. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest. When DCS filed its petition on November 9, 2020, the best interest factors were set out by statute as follows:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (West March 6, 2020 to April 21, 2021).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S*., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S*., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H*., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S*., 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In her brief, Mother argues that she has a strong bond with the Child and it would be detrimental to the Child to sever that bond. Mother argues further that her bouts of incarceration during the custodial episode made it impossible for her to complete the steps required by her permanency plans. Mother states she should be given more time to work on her permanency plans. Respectfully, Mother's arguments lack any support in the record. Far from a strong bond, the record reflects that Mother and the Child have a fraught relationship to the extent any relationship still exists at all. The Child is "terrified" by Mother and even had a "meltdown" on her last visit. For her part, Mother frequently ended visits early and tended to have visits of poor quality marked by her inappropriate behavior. Sadly, none of these facts suggest a strong bond exists between Mother and the Child.

Regarding Mother's assertion that she just needs more time to work on her permanency plans, the record reflects that Mother never attempted to fulfill her responsibilities in any sort of meaningful way in the first place. Mother fails to cite any evidence in the record in support of her contention that her bouts of incarceration prevented her from attempting to comply with any of the steps on her permanency plans or that, but for her having been in jail for portions of the custodial episode, she would have made some effort on the plans. Thus, it is pure speculation to suggest that Mother would act with any more alacrity were she to be given more time. Mother's argument also assumes she lacks any influence or agency on whether she keeps incurring criminal charges and going to jail, which renders her unavailable to parent or prepare to parent the Child. Mother is mistaken as it is Mother's actions that result in her incurring additional criminal charges and going to jail. Meanwhile, the Child remains in the limbo of foster care awaiting permanency.

What is more, even if we found Mother to be correct about having a strong bond with the Child and that she had a legitimate excuse for not doing anything required of her under the permanency plans, which we do not, the great weight of the remaining best interest factors still would favor termination of Mother's parental rights. The Child entered state custody on the basis of exposure to methamphetamine while in Mother's custody. Mother severely abused and neglected the Child. Consequently, the Child had special medical and dental needs, needs which were and are being met by his foster family. Regrettably, Mother's circumstances have not improved over the course of the custodial

episode. Among other things, Mother has been in and out of jail; she has acted inappropriately on her visits with the Child; she has paid no child support; she has failed to address her drug problem; and she has failed to remedy her mental health issues. There simply is no indication that Mother will be in a position to safely parent the Child any time soon. The Juvenile Court made detailed findings as to each of the statutory best interest factors applicable to this case. The evidence does not preponderate against these detailed factual findings. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Child's best interest.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Hope H., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE